and David Wheelock, respondent to Pellis, are doing on behalf of the county, Ms. Myra A. Feltress, are doing on behalf of the attorney, Mr. Dwayne Douglas. Okay, are both sides ready to proceed? We are. And counsel, when you're ready. Good morning. Good morning. Good afternoon. Honorable Justices, good afternoon to counsel for the appellee, Attorney Douglas. May it please the Court, my name is Myra Feltress, and I'm here today on behalf of the appellant, David Wheelock, who's also present in your courtroom today. In this case, Moira sought a decades later do-over on her portion of David's pension, and the Circuit Court erred in giving it to her. The Court's decision in Kehoe v. Farkas is precedential to this case. It's by far the most similar case to the case at Barr, unlike the original apportionment cases of Richardson and Culp, upon which the appellee relies. Moira's entire case, or entire position in this case, rests on her distinction between the timing of the entry of the quadro in Kehoe and the entry of the quildro in this case. But that's a distinction without a difference. Can I ask you this? Can you explain the argument you made before the trial court concerning your interpretation of the 2001 quildro? How did either paragraph 3-1 or 3-2 concerning a refund cap cap the benefits the petitioner could receive? How is that? So I was not trial counsel, Justice Burkett. The argument before the trial court, I'm sorry, can you repeat that? How did they cap the benefits? There was a fixed amount, right, and it was subject to reconsideration later on.  The defendant, or the… You mean the relinquished argument? Respondent opened the door to this. Absolutely. He's the one who filed. Absolutely, and he shouldn't have. And the Circuit Court rightfully denied his motion, and it also should have denied Moira's. Neither of them should have gotten a second bite of the apple decades after this issue was adjudicated. Well, if the 2001 quildro was integrated into the 1999 dissolution judgment, how can you argue that its savings clause, which would also necessarily be incorporated into the judgment, is inconsistent with the judgment? You said it's inconsistent with the judgment. I don't argue that the savings clause is inconsistent with the judgment. Okay. There's not a savings clause here. There's a last sentence of the 2001 quildro provides that the court retains jurisdiction to modify its order. It's akin to the savings clause in Kehoe, and in that case, the court found that that savings clause did not permit unfettered reapportionment in the years to come. And the result should be the same here. In Kehoe, the way the court handled that issue was to say the trial court did not retain jurisdiction to allocate the pension benefits because a quildro had already been set – had already set forth the calculation of the marital portion of the pension when the judgment was entered. How do they know the value of the pension? Was it a defined benefit? I believe so, Your Honor. But the value of the pension and the value of the marital – Moira's marital portion of it was the subject of 14 months of litigation in the circuit court. I mean, it wasn't the – 2001 quildro here was not entered for 32 months after the judgment was entered. And that included 14 months of litigation. Each side had experts. There was – there was much ado about precisely what this quildro was going to provide. And that issue was adjudicated in 2001. You know, Moira now says it's the 2001 quildro that constitutes a rewriting of the judgment. I mean, she wrote it. The time to take issue with the 2001 quildro was in 30 days thereafter or, obviously, upon a – of the filing of a 14-year 01 motion, which is not what she did here. You know, what the case law provides is that if the judgment allocates a pension but is silent as to the apportionment method, then the court can decide what that apportionment method is. Obviously, there was 14 months of litigation here about how to apportion this pension, and the court made its decision and entered the 2001 quildro. There's no formula. It's just a fixed number. That's right. How can that be? If we're not – and how could it not be subject to reconsideration? Well, the new quildro was a fixed number, too, Justice Burkett. The new quildro is – except it's $1,500 more a month. And it's based on the Hunt formula. That's right. Right. There was no application of the Hunt formula in the 2001, correct? No, because the court did not apply the Hunt formula in 2001. But he hadn't retired at that point. That's right. So he retired approximately eight years later. Isn't the intention of the quildro to make sure that the spouse gets the percentage upon retirement? Certainly. Then where's the error here? The 2024 quildro entered 23 years after the first one, just picked a new apportionment method. How do we advise clients? If we can't look at the 2001 quildro and figure anything out, it's just a fixed number. We don't know how the trial court arrived at that. The parties agreed to it. They didn't agree to it. It was entered – this was the court's order following 14 months of litigation. They didn't agree to it. In fact, each of them posited different numbers. And what the court ultimately arrived at was the 2001 quildro. In Kehoe, the quadro was entered by agreement. But in our case, it was entered by the court following litigation. I mean, these issues were litigated two decades ago. I can't conceive of how you apply an entirely new apportionment method all these years later. It's just not what anyone anticipated. Does he regret having gone into court, gone back to court? Absolutely. And the court, like I said, the circuit court was right to deny his motion. But it should have denied hers too. Neither of them was entitled to change this order decades after it was entered. Property dispositions are final 30 days after they're entered. The court does not retain the continuing jurisdiction to just pick a new apportionment method, and it should decline either party's invitation to do that. No. The issue of the timing of the entry of the quildro here, I don't know if Your Honors have any questions about that or if you're interested in hearing from me on it, but it is Moira's primary point that Kehoe is distinguishable because in that case, the quadro was entered by agreement simultaneously with the judgment. And in this case, it was entered following litigation 32 months after entry of the judgment. Now, she says this is the defining difference, but she doesn't really explain why. What case law statute or other authority provides that simply by virtue of the passage of time, that final order entered later is less final than one entered simultaneously with the judgment? I'm not aware of any authority that would provide that. Richardson and Colt, they just don't apply here. Those are original apportionment cases. In Richardson, the, you know, the issue in both of those was what apportionment method to provide. And the parties were certainly, you know, free to litigate that, and whoever didn't get their preferred apportionment method appropriately went to the appellate court. But at issue there was not the modification of a decades-old order. It was the original entry of the order. In Richardson, 12 years later, in Colt 10, those cases just don't apply. You know, in Kehoe, the Court said that Richardson did not apply in that case. Because the trial court, quote, does not have the discretion to decide on a method of pension apportionment when the judgment has already done so through the party's quadro. It's exactly what happened here. The judgment was expressed through the 2001 quadro. And if anyone had issue with it, they should have taken it up with the court then, not decades later. The trial court exceeded its jurisdiction in entering the modified quadro 23 years later and altering the original 2001 quadro. I know Your Honors have had a long morning already. The judgment order dictated that each party would receive 50 percent interest in their spouse's marital portions of the pensions. Right? And did the original comply with that? The 2001 quadro? The court said it did. The court found it. I'm asking you. Did it? Did it even come close? I couldn't tell you that. During my time as a litigator, I stayed far away from quadros and quildros. They are fraught with peril. I would be scared to comment. But what I can say is that the circuit court in 2001 took the warring positions of the parties as to what that amount should be and chose this one. And no one appealed it. And no one filed a 1401 motion with respect to it later. How can there be compliance with the statutory provision about the distribution of the benefits? What statutory? If the 2001 quadro gave her, what was it, $700? I think it was $444. And ultimately she's entitled, if she's getting 50 percent to $1,500. Well. Is that fair? I think it's $1,900. And that's pursuant to the application of an entirely new formula. I mean, our position is she's not entitled to that. There was no formula specified, though. In your position, she's not entitled to the 50 percent? No. It's that the court determined what that 50 percent was in the 2001 quadro. Oh, I see. No, she's absolutely entitled to what the judgment provided her, and the court decided that two decades ago. If it was a defined contribution plan, what changed between 2021 and now? I mean, wouldn't the retirement amount be a set retirement amount? Honestly, I can't speak to what exactly the tenets of his pension are with certainty. I'm not going to misrepresent to you that I can. All I know is that the parties presented their positions with respect to the marital. Well, the marital portion was adjudicated in the judgment by the court. Actually, that was agreed by the parties. They went back to court for the court to effectuate the judgment. They presented their warrant positions, and the court made its decision as to what was required by the judgment. The mechanism to challenge that is by appeal, and no one appealed. And then, not only that, but she received payments pursuant to it for close to a decade before saying, I would like more. I mean, she explicitly said, I want a greater share of his pension. Well, that's not what you contracted for. I'm happy to address anything else Your Honors would like me to. Otherwise, I'm not going to belabor my points and repeat myself. To get back to what we talked about earlier, he opened the door. He did, yes. And now he's complaining about the result. Would a trial court, according to statute, properly apportion her share of the pension? The trial court properly apportioned her share of the pension in 2001. They were both wrong in asking for a do-over. His was rightfully denied. Now, if he had prevailed, let's say by some chance there was some way to grant both of their relief, could he come in here and say the court should never have considered this? No, of course not. You asked, too. Oh, and you got some relief you asked for. Okay, that's not the situation here. In fact, he relinquished his motion on reconsideration. He explicitly said, I'm not proceeding on it. I no longer put it forth. But just because he filed an ill-advised motion doesn't mean he somehow amended the long-established rules of property division pursuant to, you know, 75510. It doesn't mean that he's somehow able to single-handedly change the fact that a final order is final after 30 days have passed in the sentence. But isn't the quadro subject to reconsideration at any time? Is it not if there's a change in the pension? An increase, for example? There wouldn't be an increase in the – well, no. I mean, pursuant to the original quadro, the marital period was identified and her share of it was identified. If his pension – I'm not sure what you mean by went up, but if it went up, if it's changed to some respect after that, she wouldn't get to experience the benefits of that. No. I mean, after the divorce? No. Okay. I have nothing further. You do have a few more minutes. Do you have any other questions? I'm going to sum up your position, then. I'll give you a chance to do that. Certainly, certainly. So the trial court exceeded its jurisdiction in entering the 2024 quadro 23 years after the entry of the 2001 quadro. And we'd ask that the court vacate the August 2024 quadro, reinstate the 2001 quadro, and, of course, as a subsidiary order, the court would also need to vacate the July 6, 2023 order requiring that an amended pension applying the entirely new apportionment method of the Hunt formula be prepared. Okay. Thank you very much. Thank you. And you're ready, counsel. Good afternoon. Good afternoon. I'm Dwayne Douglas for Apelli. May it please the Court, Counsel David, I believe, and Counsel Federer. Counsel, how do we not have race judicata here? Well, to me, if a race judicata is to be applied anywhere, it would be applied to the underlying judgment itself. With respect to a quadro, those are subject to being modified. Indeed, the most recent iteration concludes with language noting that the quadro can be modified to conform with the judgment. And that language in the most recently entered quadro comes straight out of 111-119. The statute itself within the pension code regarding quadros has a model quadro form. Well, didn't the court in 2021 give a specific, they didn't give you a specific allocation method, but they gave a specific allocation, did they not? They gave a specific dollar amount, correct. To $400,000. Correct. And in answer, in further answer to that and a question posed to my opponent, I presume part of the difference in the numbers is because the way that Hunt operates, it takes into account all of the years of service, right? So here you have a quadro entered about two years later. So if years of service continue, you would see a greater benefit at one, well, I have two things to say, one would think that is part of between the 2021 number of 444.70 and the last year's number of 1909.25 cents. But as far as the record, you only see what you see. So with respect to 2001. So the pension amount, the base amount of the pension grew from 2021. If the denominator in Hunt grew, because some of the complaints to using Hunt that you see out there are, well, wait a second, applying Hunt, you're taking into account service after the divorce. Right. Well, right. And I'm just going by what I see here. But that doesn't matter. Well, that objection to Hunt in Hunt itself and in other cases has been overruled. I mean, I can see an opposite result in the law, but it isn't. So as you get to when you can draw off the pension and you get what you get, if you're applying Hunt, if you're applying the reserve jurisdiction approach, you are taking into account the total amount of the pension, something that's due to service after the divorce. But what Hunt also correctly does, I believe, in the numerator, it gives you your share. So this much of this, and I know I'm being recorded, but it just rang on my ants, this much of this is marital. And then you apply the percentage to that, and that's how you wind up with your number. But the record is scant as to what the court, how the court arrived at its number, both in 2001. You have a little indication there. You see references to exhibits and so forth. There's no transcript, no nothing. So I know and I believe that Supposing Counsel's reply brief, she mentioned that it looks like Hunt was rejected in 2001, but you can't tell. You can't see exactly what was advocated for. You see the results and you see that there were exhibits, but a number was generated. Moving forward to last year, you have nothing. It looks to me from the record itself agreed in part, agreed to the amount, agreed to if you're applying Hunt, that's the number. But I don't see what I see. She's right, it doesn't say agreed. But I don't see in the record any contest there. And that creates a problem in my mind as to what are we arguing about. How are we saying? Because Counsel just earlier said that, you know, I agree it should be 50%. It should be 50%. The judgment is the judgment. Okay. Let's unpack that a little bit. If David agrees that the judgment provides 50% and that's right, how? Is the order in the list wrong? Unless you're just saying automatically it has to be the 2001 number. But that's a argument. But my problem, several, but one is you don't see in the record where it was argued in 2024, okay, yes, I get it. We're here to have an enter and emitted quadro, a quadro, excuse me. I knew I was going to mix those up, quadro and quadro. Happens all the time. But I think there needed to be a contest in the record made in 2024 of making of record what the numbers should be now. And that didn't happen. And we needed a second notice of appeal to draw that out. That to me is a problem. Would it have been wiser in 2020, was that three? Four maybe. No. Excuse me, 2021 to have used a percentage as opposed to a dollar amount. And would the case law allow that at that time? Well, I'll ask the question again so I can be sure what I'm answering. I'm sorry. You're asking? Would it have been proper or wise for the trial court as opposed to entering a dollar amount during the settlement to impose a percentage of the pension? I think, I think the quadros both by, because you have to tell the plan administrator to do something. So, I mean, I think it's okay for a quadro once it percolates through. But it has to be based upon the percentage. And again, I don't have the entire form in my head, but section 119 of the pension code identifies exactly word for word what it should say. I think it has a dollar amount, I think. But I'm sorry. In 2021, there was speculation as to what, this is your position, there was speculation as to what the quadro would be. In 2021, there was, by speculation you mean a contest, absolutely. I mean, you could tell that it was highly contested. You could see the exhibit was singular. I'm saying, I am saying this is speculation. How did we come to 444? Like you say, now you come to this point and you have a larger dollar amount than you did back then. That's what I'm saying. In 2021, are you submitting that it was speculation as to what the quadro would be? Yeah, how many years later? That could be, and I'll reiterate, the record isn't clear enough for me to point to anything. Other than the fact that there was a contest, no record, no bystanders report, no transcripts, and a number generated. The only thing, the principal thing that comes to my mind is what I said earlier, that the additional years of service. And that's the complaint. It doesn't move the number up. Which is why I'm asking you what a percentage of it was wiser as opposed to a dollar at the time. You could be, I could work. I mean, because if it was a percentage, then it could have just automatically kicked into that higher dollar amount later. Then you don't have this argument that you made an agreement, there was an agreement. The court entered this. You signed on to it. And now here you are, how many years later, coming back and saying, wait, I need more. If that can be. Because I'm not raised judicata. That was why you asked. So to be raised judicata, again, is the underlying judgment. There can't, because here's the way I look at it. My simple way of looking at it is to look at it from outside of quadros and quadros. Like every divorce lawyer that works in the trial courts, if I need to hear the word quadro or quadro, it's anathema. So here's the way I look at it. Let's say you have a supporter, okay. Let's say it says 1,000 a month plus 20% bonus or something.  Yeah, yeah, yeah. I'm just analogizing to get it in my head more simply. And let's say later you enter a withholding notice that just references 1,000 a month. Does that mean you can't, and I know this isn't exactly analogous. I'm just trying to make it simplified. Does that mean you can't enter a different withholding notice later because you left out the percentage? No, you can. So to me, that's Allen, basically. Yeah, but the difference here is I asked if this was a defined benefit. The difference is you should have known or maybe you couldn't know at the time what the full amount of that pension was going to be because it hadn't really vested at that point, correct? If contributions were being made, if there were years of service after 2021, that number is automatically wrong. I mean, because that would grow the benefit. That grows what the, so that it couldn't lock into a dollar. It shouldn't. It argues that this number is right because this order was entered this last year. But why would an attorney lock a client into that? Thankfully, I didn't. And maybe it was premature to enter it then. It's hard to say. Like my opponent, most people, I don't do these in the trial court. And you make a good point that if you do it, if you enter the quota where it's a pension rather than a 401K, referencing your distinction between defined contribution plans and defined benefit plans, if you do it too quickly, maybe you're automatically generating the wrong number. So shouldn't she, she entered into this agreement, basically. Why should she not be married to this agreement? Well, the agreement wasn't in the 440-70. The agreement was 50 percent, whatever that is. And you see the final expression in what the 50 percent is. Yeah, it was 50 percent, but who came up with the 440-4 or whatever? The judge all touched it. Yeah. Right. So it was not from, I mean, both sides had their positions, but neither party agreed. But where we're at here is can you do this? So there was a lot of talk about these orders are old, it's long ago. But all these orders say within their terms that you can modify them. Both, the 2001 order and the 2024 order, both speak to an ability to modify. Because what David wants is the number from 2001, and I get that. But the judgment is the judgment. And these quill drills are only enforcing that underlying judgment, enforcing that 50 percent. So the thing, back to your point about race judicata, there was some discussion, and I don't know if it's been with you or in the briefs, about the non-modifiability of a property settlement, and that's per 502 of the IMDMA. That which cannot be modified is the terms of the judgment. It's a property settlement. So all of this has to flow from what was ordered in 1999. Indeed, in theory, if the 2024 order doesn't fully express what was originally ordered in 1999, it would be subject to being overridden by a subsequent 100 quill drill. All any of this has to do is to get to the alternate payee 50 percent of the balance as of April 26, 1999, from his share of the Lake Zurich fire pension. And whatever accomplishes that is what needs to happen. But that's not what the agreement from that date says. From 1999? Yeah, it says she shall get 444 when he starts collecting his pension. Oh, no, no, no. That's the ruling. The 444 is the ruling on the 2001 contested hearing. Right. The judgment just has the percentage. The judgment doesn't have a dollar amount. It's the quill drill order. Quill drill order entered a couple of years after the judgment does have the $440.70. That was not the agreement. That was the court's ruling to enforce the previously entered agreement, which provided 50 percent of the balance. So if she didn't like it, didn't she have 30 days to go back in and say, I don't agree with that? She could have. So that was a possibility, that the fact that that was not done doesn't foreclose what is happening here, both by operation of law, both looking at the pension code itself, which explicitly recognizes whether you look at F3 of 1119 or F4, the modification of a quill drill. That's F3, the modification of a quill drill calculation order. That's F4, the model language set out in 1119 expressly states that you can enter amended quill drills to conform with MSA and the judgment. So the law, the pension code itself speaks to, you can come back and change these, because the thing you're doing isn't locking yourself in with a prior quill drill or whether or not it's right. The thing that's locked in is the underlying judgment itself. You saw it in Allen, exactly that happening, where you had a number in the judgment, a different number in the numerator. At the time the quadro was entered, the plan administrator went with the quadro, so the alternate payee moved to enter an amended quadro. Oh, look, you've got to do what the underlying judgment says, and the trial court agreed. And to your point about do you have the 30 days, in Allen, the court, in answer to that exact argument that was made there, said that it isn't an issue having the 30 days, because this actually, when you're entering this order, and in that case it was a quadro, the court has indefinite jurisdiction to... So the court maintains jurisdiction. The language I believe in Allen was the court has indefinite jurisdiction to enforce the judgment.  Do you have any explanation as to why Margaret's expert prepared the quadro when it was supposed to be the respondent? No, I don't. I can't confirm that. I can't. I don't want to see what you say. And I think you've answered the question as far as the years that passed. The years don't matter. Right. It's all about enforcing the judgment. Enforcing the underlying judgment. I mean, it provides what it provides. When did you become aware that the 2001 quadro was entered? When did you find out that that... When did I find out what? When did Marga refund? There was some discussion about whether there was notice to her. A counsel is saying she was present in court. Is there a transcript reflecting that? No. No. There's neither a transcript or bystander support regarding what happened. I believe, and I let the record speak for itself if I'm misstating, but I believe counsel is relating that there's someone in order, it says. But your position is that she didn't just sit on the lights? No. No. No. No. No. And her rights are, again, the enforcement of the underlying judgment. And we've had... Actually, all the court actually did last year is enter a quarter saying, here's half. There's nothing in the order granting an amended leave for an amended quadro issue in July of 23. There's nothing in the language of the quadro that was entered in August of 24 that says we're changing and giving her more than 50%. That's nowhere. So all that she's getting is what she originally bargained for in 1999. And that's all. Thank you for your time. Any additional questions? No. Okay. Any questions? Counsel can reply. Just briefly. With respect to what went on when the original quadro was entered, Moyer's initial draft quadro asked for $1,300 plus per month at the time of the original apportionment, the litigation surrounding the original apportionment. In 2001. That's right. $1,352.15. And that's in the record. Her revised order, the one that was later entered, provided her with $444 a month. My client also had a draft in that mix. But her two drafts, $1,352 and $444. It's obvious that there was extensive litigation surrounding the amount to which she was entitled under the judgment. And, again, that was adjudicated in 2001. None of these arguments about the pension code were made in the briefing. Does the statute allow a spouse to come back in and revisit the amount of the quadro? Are they precluded from ever coming back in and challenging that amount or asking for more or a change? Kind of like support? On a 1401 basis, they absolutely could. Fraud, duress, mistake, just like anything else. I mean, when counsel says — How about because of the dollar amount of the pension or, I don't want to say inflation, that would kind of apply maybe to child support? Yeah. But does anything preclude her from coming back in and asking for more? Yes. Other than, you think, race to the top. Absolutely. And this was a final property disposition. You don't get to come back decades after your divorce and say, actually, I wish I would have gotten more. I should have stuck with that. That $1,352 draft of the quadro, I should have insisted on that. I should have forced it to trial. Please give me that now. I changed my mind. And for counsel to say the failure to appeal doesn't foreclose further action, I mean, is that true with anything else? I mean, talk about casting the net wide. The failure to appeal does not foreclose later action. I mean, these are the rules we all live under, right? Your 31st day passes, and unless you have a petition for leave to file a late notice of appeal, you're out of luck, unless you have 1401 grounds. So I don't know where that comes from. I think you asked, Justice Shostak, who came up with the 444? She did. She did. It's her draft. The court came up with it, you said? I mean, it's her draft, for sure. Yes. The court entered it. It was the draft she provided after relinquishing the draft providing for $1,352 a month. With respect to res judicata, I mean, the three elements are easily met here. I can't see a way around that. Of course, we're always too close to our own cases, but I don't see a way around that. If there's nothing further? Well, counsel just argued again. All that Moira asked is to enforce the judgment, the 1999 judgment. The judgment was effectuated in 2001. That was the effectuation of the property disposition in the judgment. There are very specific circumstances under which you can challenge that later, and this is not one of them. Not simply seeking a greater share of David's pension. You can't say, I wish I got more. You just can't. You can't. The statute reserves jurisdiction for the court to modify the judgment later on.  In an Allen-type situation where there's essentially a Scribner's error, some sort of ministerial error, absolutely. Well, the failure of the court to specify the calculation, isn't that an error? I'm not aware of any precedent provided. The judgment provides that she gets 50%. You know, I'm glad you asked that because I kind of forgot I wanted to bring this up. If you look at the judgment, what it actually provides is, David shall execute a quadro transferring the 50% of the balance as of April 26, 1999. Thank God I did not write this. But, you know, and at the time of the party's divorce in April 26, 1999, he had paid in approximately $44,000 into his pension. 50% of the balance via quadro. Which is why he then later went in and said, I'm done paying. I paid 50% of 44 plus odd thousand dollars. But, I mean, you know, on the actual, you know, we're all saying, oh, it's 50%, 50%. Well, it's a little bit more specific than that. That was about in the event there was a refund. The 20,000 was in the event there was a refund. That was in the 2001 quadro, that $20,000. If there was a refund, she would get half of what he had contributed. Right. 50% of the balance as of April 26, which was about $44,000. So it is kind of, I mean, obviously this portion of the judgment was inartfully prepared. It was. But it's not exactly 50%. It's not, it doesn't stop at 50%. There's some more language there that makes this, unfortunately, even a little more confusing, complicated, difficult. So I did want to address that. So thank you for raising that issue. If the Court has nothing further. Thank you. Thank you very much. We will be in recess until our next case at 2 p.m. I thank both counsel for interesting arguments this afternoon on a tricky issue. Thank you. All rise.